# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

JAMES PITTS, # 121642, *

  Plaintiff, *

vs. * CIVIL ACTION NO. 19-00038-TFM-B

C.O. BULLARD, *et al.*, *

  Defendants. *

## REPORT AND RECOMMENDATION

Plaintiff James Pitts, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. (Doc. 1). This action has been referred to the undersigned Magistrate Judge for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R) and is now before the Court on Defendants' motion for summary judgment. (Docs. 25, 26, 36, 37, 38). For the reasons discussed herein, it is recommended that the motion for summary judgment be **GRANTED**, and that this action be **DISMISSED**.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff James Pitts brings this suit against Defendants Warden Cynthia Stewart, Warden Phillip Mitchell, Warden Terry Raybon, Captain Vencini Smith, Captain Regina Bolar, Lieutenant Ashley Kidd, Correctional Officer Jermaine Bullard, Correctional Officer Vincent Norman, and Correctional Officer Douglas Parham,

for failing to protect him from being stabbed multiple times by another inmate while working in the dining hall at Holman Correctional Facility ("Holman") on July 1, 2018.

Pitts claims that at the time of the stabbing, Ms. Brown, a female mess steward, was left to monitor the cooking area alone, while approximately 135 inmates wandered in and out of the kitchen unguarded. (Doc. 1 at 4).[1] Pitts also claims that Ms. Byrd,[2] the chief steward, had been complaining every day of the need for reliable security in the dining hall, "in light of the fact that Holman Prison is the most notoriously dangerous-est [sic] prison in the State of Alabama." (Id. at 5). Pitts states that "[j]ust recently before" his own stabbing in Holman's kitchen, "Officer Bettis had gotten killed in there by a stab wound to his neck area over some inmate wanting extra French fries." (Id.). He also contends that "several inmates got either stabbed or their throats slashed while eating in there." (Id.). Pitts states there is a metal detector (or an apparatus similar to a metal detector) at

---

[1] Because Pitts' complaint was signed under penalty of perjury (see Doc. 1 at 13), the Court will consider the factual allegations in the complaint in ruling on the motion for summary judgment. See Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam). However, the undersigned notes that "the 'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[2] The stewards, Ms. Brown and Ms. Byrd, are not parties to this action.

the entrance to the kitchen, but it does not work.  (Id. at 5-6).

According to Pitts, he was attacked because of the lack of security

in the kitchen, which Defendants knew to be an unsafe environment.

(Id. at 6-7).

Pitts is suing Defendants for failing to protect him from the

inmate-on-inmate attack in violation of the Eighth Amendment.

Specifically, Pitts alleges:

> Officer Bullard, who was assigned to guard the kitchen, abandoned his post to go to the exercise yard, causing Pitts to be stabbed.  (Id. at 4, 8).

> Warden Cynthia Stewart "knew that the kitchen was a dangerous area because guys bring knives in there on a regular basis" and failed to create a safe living environment.  (Id. at 5, 8).

> Wardens Mitchell and Raybon knew of the dangerous kitchen environment because both were employed at Holman when Officer Bettis was killed "and when several inmates got either stabbed or their throats slashed" while eating in the kitchen, yet the deputy wardens failed to take measures to curtail the violence in the kitchen.  (Id. at 5-6, 9-10).

> Captains Bolar and Smith knew of the dangers of an unguarded kitchen, but neither acted to create a system or plan to curtail the unsafe living environment for inmates eating and working in the kitchen.  (Id. at 6, 11-12).

> Lieutenant Kidd, as the shift commander and supervisor at the time of the incident, was responsible for assigning posts and informing the officers not to leave their posts unless and until a relief officer came around to give the officer a fifteen-minute break.  (Id. at 6, 10).

> Officers Norman and Parham were responsible for "monitoring the chow line that day" to ensure that no one ate twice and that inmates exited the kitchen in an orderly fashion, but the officers left their posts, thereby causing Pitts to be attacked.  (Id. at 6, 10-11).

Pitts is suing the Defendants in their individual capacities and is seeking $20,000 in compensatory damages and $100,000 in punitive damages from each Defendant. (Id. at 1, 13).

Defendants filed answers denying Pitts' allegations against them and asserting all available immunity defenses. (Docs. 25, 36). Defendants also filed special reports in support of their position. (Docs. 26, 37). Defendants maintain that the stabbing resulted from an argument between Pitts and another inmate over four packs of cigarettes and was not the result of any deliberate indifference to Pitts' safety. In support of their position, Defendants have submitted sworn affidavits; the Incident Report; the Duty Officer Report; Pitts' Body Chart; the Evidence Form for the weapon used to stab Pitts; the Post Assignment Roster; the Duty Post Log; the Institutional Security Inspection Report; and the Shakedown Sheet for July 1, 2018. (See Docs. 26, 37).

In affidavits attached to their special report, Wardens Stewart, Raybon, and Mitchell aver that they were not present at Holman when the incident occurred on July 1, 2018. (Doc. 26-1 at 1; Doc. 26-2 at 1; Doc. 26-3 at 1). In response to Pitts' allegations that they did not have safety measures in place to curtail the violence in the dining hall, the wardens aver that Holman has several procedures in place to reduce incidents such as

4

stabbings.[3]  (Doc. 26-1 at 2; Doc. 26-2 at 2; Doc. 26-3 at 2).

They state that frequent unannounced searches are conducted of an

inmate's person, inmate living areas, and other areas of the

facility; that all officers are required to conduct at least five

random searches of inmates, their personal property, and their

assigned living areas per day; and that monthly area searches of

Holman are also conducted.  (Doc. 26-1 at 2; Doc. 26-2 at 2; Doc.

26-3 at 2).  Citing the Incident Report, the wardens assert that

Pitts and the inmate who stabbed him created the dangerous

situation by failing to adhere to Alabama Department of Corrections

("ADOC") rules against trading, bartering, or accepting gifts from

another inmate.  (Doc. 26-1 at 2; Doc. 26-2 at 2; Doc. 26-3 at 2).

The wardens also state that a review of the post assignment for

the day in question reflects that a correctional officer was

assigned to the post as a kitchen officer.  (Doc. 26-1 at 2; Doc.

26-2 at 3; Doc. 26-3 at 2).[4]

---

[3] The wardens state that every inmate incarcerated by the Alabama
Department of Corrections goes through orientation with a staff
member who explains the information provided in the inmate handbook,
which sets forth ADOC's major rules, regulations, and policies
that apply to everyone and are designed to help the inmate
population live together as safely and comfortably as possible.
(Doc. 26-1 at 1; Doc. 26-2 at 1-2; Doc. 26-3 at 1-2).

[4] Captain Bolar's declaration echoes the wardens' statements
regarding the inmate handbook, the procedures in place to reduce
stabbing incidents, and the subject incident itself.  Captain Bolar
states that she is no longer employed by ADOC but was employed as
a Correctional Captain at Holman at the time of the incident in
question.  (Doc. 37-1).

In his affidavit, Officer Bullard avers that he "was assigned as a kitchen rover" on July 1, 2018, and was pushing the food cart to Death Row at the time of the stabbing incident. (Doc. 26-4 at 1). Thus, he did not observe the stabbing. (Id.). Officer Bullard denies that he left or abandoned his post, and he further denies that he failed to protect Pitts. (Id.). Officer Bullard contends that there was security in the kitchen at the time of the incident and states that when the code was called, he responded to the kitchen to assist. (Id.).

In his affidavit, Officer Parham attests that he "was the assigned Kitchen Rover" at Holman on the date of the incident. (Doc. 26-5 at 1). According to Officer Parham, he observed Pitts and inmate Willie Zimmerman doing "what appeared to me to be horse playing" but realized upon further observation that inmate Zimmerman was stabbing Pitts. (Id.). Officer Parham states that he started running toward the two inmates while giving several loud verbal commands to stop, and that inmate Zimmerman ran out of the kitchen, while Pitts was escorted to the Health Care Unit for medical assessment. (Id.). Officer Parham declares that he did not leave his post and was monitoring the dining hall. (Id.).

Officer Norman avers that he has no knowledge of the stabbing incident because he was not on duty on the date it occurred. (Doc. 26-6).

The Holman Post Assignment Roster(for "B-Day" shift) reflects that on July 1, 2018, Lieutenant Kidd was assigned as the Population Shift Commander, Officer Bullard was assigned as the Kitchen Rover, and Officer Parham was assigned as the "E-Rover". (Doc. 26-7 at 2). The July 1, 2018 Duty Post Log (for "B-Days" shift) likewise reflects that Lieutenant Kidd was assigned as the Population Shift Commander, Officer Bullard was assigned as the Kitchen Rover, and Officer Parham was assigned to Housing Unit E. (Id. at 7). Defendant Wardens Stewart, Raybon, and Mitchell, Captains Bolar and Smith, and Officer Norman are not listed as being on duty at time of the stabbing incident. (See id. at 2, 7).

The Duty Officer Report indicates that at approximately 1:30 p.m. on July 1, 2018, steward Rhonda Brown observed inmate Zimmerman[5] stabbing Pitts inside the kitchen. (Id. at 4). Assistance was called, the knife was recovered, and both inmates were restrained and escorted to the Health Care Unit for medical assessment. (Id.). Pitts had several puncture wounds to his back and right arm, while inmate Zimmerman had no injuries. (Id.). According to the Duty Officer Report, both Pitts and Zimmerman

---

[5] The Duty Officer Report identifies Pitts' attacker as "inmate Willie Thompson B/136789" at one point, but this appears to be a typographical error in reference to inmate Zimmerman. (See Doc. 26-7 at 4).

"stated that the incident transpired over four packs of Tops cigarettes being owed to another inmate." (Id.).

The Incident Report reflects the same incident facts as the Duty Officer Report and expounds on the events following the incident. Specifically, the Incident Report adds the following details: that Correctional Officers Bullard, Robert Kelley, Antywon Madison, and Nathan McQuirter[6] responded to the incident after steward Brown called for assistance in the kitchen; and that the knife used to stab Pitts was approximately six-and-a-half inches long and sharpened to a point with a cloth wrapped around the handle. (Id. at 3).

The July 1, 2018 Duty Post Log reflects that Officer Parham performed a ball yard check from 12:20 p.m. to 12:22 p.m., and the population ball yard was opened at 12:23 p.m. and closed at 2:03 p.m. (Id. at 9-10). The Duty Post Log also reflects that Officer Kelley moved Pitts from population to the hospital ward at 2:00 p.m., and that Officer Bass placed inmate Zimmerman in segregation at 5:40 p.m. (Id. at 9, 11). The Duty Post Log further reflects that Officer Bullard was assigned to the serving line during the

---

[6] The Post Assignment Roster and Duty Post Log reflect that Officer Kelley was assigned as the Hall Rover, Officer Madison was assigned to Cubicle #5, and Officer McQuirter was assigned as the Segregation Rover. (Doc. 26-7 at 2, 7).

breakfast, wellness, and dinner meals on July 1, 2018. (Id. at 8-10).[7]

Pitts' Body Chart was signed by a nurse at 1:45 p.m. on July 1, 2018. (Id. at 5). It reflects that Pitts suffered a puncture to his right shoulder/neck area; nine punctures and three abrasions to his upper back; an abrasion to his left face; a puncture to his left neck; a puncture to his left lower arm; an abrasion to his right upper arm; a laceration to his left thumb; and an abrasion to his left middle finger. (Id.).

The Institutional Security Inspection Report is signed by Lieutenant Kidd but is otherwise left blank. (See id. at 12). The Shakedown Sheet reflects that no contraband was confiscated in Holman's housing units on July 1, 2018 "due to staff shortage." (Id. at 13).

In an order dated April 22, 2021, the Court converted Defendants' answers and special reports (Docs. 25, 26, 36, 37) into a motion for summary judgment, explained to the parties the procedure for such motions under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional

---

[7] The Duty Post Log reflects that feeding of the breakfast meal was in progress at 7:16 a.m. and was completed at 8:26 a.m.; feeding of the wellness meal was in progress at 10:40 a.m. and was completed at 11:36 a.m.; and feeding of the dinner meal was in progress at 3:40 p.m. and was completed at 5:22 p.m. (Doc. 26-7 at 8-10).

information or evidence in support of or in opposition to the motion by June 10, 2021. (Doc. 38).

Pitts filed a sworn affidavit in response to Defendants' summary judgment motion, which states the following:

> On July 1, 2018, while I was working in the chow hall at Holman Prison, when we got to the last dormitory (D dorm), I was attacked and stabbed by an inmate nicknamed "Big Will." He stabbed me multiple times to my back (three times), to my right shoulder, to my right arm, and in my left side, one time each.
>
> There was no security at that time in the chow hall. Officer Bullard who was the assigned Rover for the kitchen that day had left to go open the exercise yard up for D dorm because for the first time in almost three months a dorm was finally going to get a chance to exercise and breathe fresh air. Because the camp had been on lockdown because of inmate on inmate violence.
>
> The mess steward who was on duty for that meal was Ms. Brown. She had to call the code. Because no correctional officer was monitoring the chow hall.

(Doc. 41-1 at 15-16).

Pitts asserts that his stabbing could have been prevented if Officer Bullard had not abandoned his assigned post in the kitchen to open the exercise yard, which resulted in the inmates being left unprotected in the dining hall. (Id. at 20, 28). According to Pitts, the Defendants all knew that Holman "was on lock-down status" and "had been extremely violent since 2014. Although it had been notoriously violent ever since 1969." (Id. at 21). Pitts claims that "[a]ll of the wardens and high ranking personnel knew

that the kitchen was dangerous, but still the security left."
(Id.).

Pitts maintains that Officer Parham's statement that he was
"the assigned Kitchen Rover" and witnessed the incident is false,
as evidenced by the institutional records showing that he was
assigned "to be E-Dorm rover, not the Kitchen rover." (Id. at 30).
Pitts contends that Officer Bullard's statement that he was pushing
the food cart to Death Row at the time of the incident is also
false, and that Officer Bullard in fact left his assigned post in
the kitchen "to do the fence check to open the exercise yard . . .
just before Pitts got stabbed." (Id. at 31). Pitts also contends
that Lieutenant Kidd falsified the institutional records to list
incorrect feeding times; to reflect that Officer Parham performed
a security check of the exercise yard at 12:20 p.m.; and to
indicate that the prison was not on lockdown status. (Id. at 30-
31, 37).

After a thorough review of the pleadings, the motion for
summary judgment is ripe for consideration.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is
no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
"[T]he mere existence of *some* alleged factual dispute between the
parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by showing or pointing out to the district court that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id.</u> at 322-24.

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (quoting <u>Celotex</u>, 477 U.S. at 324). "To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be

sufficient for a jury to find for that party." LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998) (citations omitted).  In other words, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In considering whether the Defendants are entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff Pitts.  See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts.  A genuine dispute requires more than "some metaphysical doubt as to the material facts."  A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) (per curiam) (internal citations omitted).  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).  Furthermore, where "opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

####    A. Qualified Immunity.

Defendants contend that they are entitled to qualified immunity because Pitts cannot show a deliberate indifference claim under the Eighth Amendment. "The defense of qualified immunity completely protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Marbury v. Warden, 936 F.3d 1227, 1232 (11th Cir. 2019) (per curiam) (citations omitted). Since there is no dispute that the Defendants in this action were acting within their discretionary authority when the acts in question occurred, the burden shifts to Pitts to show (1) that Defendants violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation.[8] See id. The Court's qualified immunity "inquiry 'can begin with either prong.'" Id. at 1233 (citation omitted).

---

[8] The Eleventh Circuit has identified three different ways in which a plaintiff can demonstrate that a constitutional right is clearly established:

The Court now turns to Pitts' asserted claims to determine whether the summary judgment evidence shows that Defendants violated a constitutional right.

**B.   Eighth Amendment Failure to Protect.**

As noted above, Pitts seeks redress pursuant to 42 U.S.C. § 1983 for Eighth Amendment violations based on an attack by a fellow inmate. (See Doc. 1).  The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment

---

First, a plaintiff can show that a materially similar case has already been decided.  This category consists of binding precedent tied to particularized facts in a materially similar case.  In determining whether a right is clearly established under this prong, only materially similar cases from the United States Supreme Court, this Circuit, and/or the highest court of the relevant state can clearly establish the law.  Second, a plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case. [T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.  Put another way, in the light of pre-existing law, the unlawfulness must be apparent. Third, a plaintiff could show that the case fits within the exception of conduct which so obviously violates [the] Constitution that prior case law is unnecessary. This third test is a narrow category encompassing those situations where the official's conduct lies so very obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding lack of case law.

Waldron v. Spicher, 954 F.3d 1297, 1304-05 (11th Cir. 2020) (internal citations and quotation marks omitted).

they receive while in prison.  <u>Farrow v. West</u>, 320 F.3d 1235, 1242 (11th Cir. 2003); <u>Bass v. Perrin</u>, 170 F.3d 1312, 1316 (11th Cir. 1999).  The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a duty on prison officials "to 'take reasonable measures to guarantee the safety of the inmates.'"  <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  <u>Farmer</u>, 511 U.S. at 834.  The Eleventh Circuit has stressed "that a 'prison custodian is not the guarantor of a prisoner's safety.'"  <u>Purcell v. Toombs County, Ga.</u>, 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted).

"A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond reasonably to the risk.'"  <u>Caldwell</u>, 748 F.3d at 1099 (emphasis in original) (citation omitted).  To survive summary judgment on a failure-to-protect claim, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the

defendants' deliberate indifference to that risk; and (3) causation." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (quotation omitted).

The first element — a substantial risk of serious harm — is measured against an objective standard. Caldwell, 748 F.3d at 1099. Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

The second element — the prison official's deliberate indifference to the risk — "has both a subjective and an objective component." Marbury, 936 F.3d at 1233. "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" Caldwell, 748 F.3d at 1099 (citation and alterations omitted). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. To meet the objective component, a plaintiff must produce evidence that the defendant disregarded the known substantial risk by failing to respond to it in an objectively reasonable manner. Caldwell, 748 F.3d at 1099. "The known risk of injury must be '"a strong likelihood, rather than a mere possibility"' before a [prison official's] failure to act can

constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (citations omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" Id. Where more than one defendant is alleged to have been deliberately indifferent, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).

The third element — causation — requires a plaintiff to demonstrate a link between a defendant's act or omission and the excessive risk of harm, and a link between the risk of harm and the plaintiff's injury. LaMarca v. Turner, 995 F.2d 1526, 1538-39 (11th Cir. 1993).

### Defendants Bullard, Parham, and Norman

In support of their motion for summary judgment, Defendants have produced evidence that the Defendant correctional officers did not act with deliberate indifference to a known substantial risk of serious harm to Pitts on July 1, 2018. First, Defendants have shown through the personal affidavit of Officer Norman and the Post Assignment Roster and Duty Post Log that Officer Norman was not at Holman when Pitts was stabbed on July 1, 2018. (See Doc. 26-6; Doc. 26-7 at 2, 7). Pitts has offered nothing to dispute Officer Norman's testimony and the records showing that

Officer Norman was not present at the facility on the day of the stabbing.

Second, Defendants maintain that Officers Bullard and Parham did not "abandon" their posts as alleged by Pitts.  Officer Bullard avers that he was assigned as "a kitchen rover" on July 1, 2018, but he states that he was not in the kitchen at the time of the incident because he was pushing the food cart to Death Row.  (Doc. 26-4 at 1).  Officer Bullard further states, and the Incident Report reflects, that he responded to the call for assistance in the kitchen and helped secure both inmates in handcuffs and remove them from the kitchen.  (Doc. 26-4 at 1; Doc. 26-7 at 3).  Pitts does not dispute that Officer Bullard was not present in the kitchen at the time of the incident.  Instead, Pitts quarrels about the nature of the work task that caused Officer Bullard to be away from the kitchen.  (See Doc. 41-1 at 16).

Officer Parham states that *he* "was the assigned Kitchen Rover" and "was monitoring the dining hall" at the time of the incident. (Doc. 26-5 at 1).  Officer Parham attests that he did not leave his assigned post in the kitchen and in fact witnessed the attack on Pitts.  (Id.).  According to Officer Parham, he initially thought Pitts and inmate Zimmerman were "horse playing" but subsequently realized Pitts was being stabbed, at which time he ran toward the inmates while giving several loud verbal commands to stop.  (Id.).  Officer Parham states that inmate Zimmerman then

ran out of the kitchen, and Pitts was escorted to the Health Care Unit.  (Id.).

The burden now turns to Pitts to show that the Defendant officers knew he was at substantial risk of serious harm and acted with deliberate indifference to that risk.  Pitts has highlighted a number of contradictions between the institutional records and the testimony of Officer Parham in particular, and the Incident and Duty Officer Reports are consistent with Pitts' general description of the incident itself.  Pitts avers that there was no correctional officer monitoring the dining hall at the time of the incident, and that the female mess steward, Ms. Brown, "had to call the code."  (Doc. 41-1 at 16).  Pitts correctly notes that the Post Assignment Roster and Duty Post Log confirm that *Officer Bullard* was the assigned Kitchen Rover, while Officer Parham was assigned as the rover for Housing Unit E.  (See Doc. 26-7 at 2, 7; Doc. 41-1 at 5, 16, 22-23).  Indeed, Officer Parham's testimony that he witnessed and responded to the incident is not corroborated by the Incident and Duty Officer Reports, which both state that it was the mess steward, Ms. Brown, who witnessed the stabbing and called for assistance.  (See Doc. 26-5; Doc. 26-7 at 3-4).  In addition, the Incident Report states that Officers Bullard, Kelley, Madison, and McQuirter responded to the incident, but it makes no mention of Officer Parham.  (See Doc. 26-7 at 3).  Also contradicting Officer Parham's testimony are the statements in

both the Incident and Duty Officer Reports that *both* inmates were restrained and escorted to the Health Care Unit for assessment. (See Doc. 26-5; Doc. 26-7 at 3-4).

For purposes of this motion, the Court accepts Pitts' sworn allegations as true, including his testimony that there was no correctional officer monitoring the dining hall at the time of the incident. However, having reviewed the record at length, and accepting as true Pitts' version of the stabbing incident, the Court finds that Pitts has nevertheless failed to put forth probative evidence showing deliberate indifference to an objectively substantial serious risk of harm posed by inmate Zimmerman or any other inmate to Pitts prior to the attack on July 1, 2018.

First, Pitts presents no evidence that even he was aware or fearful of a possible attack at the time it occurred.[9] There is also no evidence that Pitts and inmate Zimmerman (or any other inmates in the kitchen) were considered enemies at the time the incident occurred. Nor has Pitts demonstrated that any of the named Defendants were apprised that any inmate at Holman posed a risk to Pitts' health or safety. See McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir. 1991) (stating that a plaintiff "normally proves actual knowledge of impending harm by showing that he

---

[9] In his complaint, Pitts states that the attack "surprised" him. (See Doc. 1 at 7).

complained to prison officials about a specific threat to his safety"), <u>overruled in part on other grounds by</u> <u>Farmer</u>, 511 U.S. at 828. Thus, no reasonable fact finder could conclude that the correctional officer Defendants acted with deliberate indifference or reckless disregard to a known specific risk of harm to Pitts.

Nor is the evidence put forth by Pitts sufficient to show that he faced a generalized, substantial risk of serious harm from inmate violence in Holman's kitchen. The Eleventh Circuit has declared many times over that a claim of deliberate indifference based on a generalized risk of violence may only be established by showing "that serious inmate-on-inmate violence was the norm or something close to it[,]" which is generally evidenced by "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." <u>Marbury</u>, 936 F.3d at 1234-35 (internal quotation marks and citations omitted).

In <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579 (11th Cir. 1995), the Eleventh Circuit determined that the plaintiff had presented sufficient evidence of a generalized, substantial risk of serious harm from inmate violence to survive summary judgment where the record showed that prisoners were not segregated based on their proclivity for violence; there was only one jailer on duty; the

jailer's quarters were out of earshot and eyesight of the prisoners' cell; and fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization. Id. at 1581-84.

In Marsh v. Butler County, Ala., 268 F.3d 1014 (11th Cir. 2001) (en banc), the Eleventh Circuit held that the former inmate plaintiffs had sufficiently alleged conditions posing a substantial risk of serious harm to inmates when they alleged:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.

Id. at 1029. The Court reasoned that, "[t]aken as a whole, these alleged conditions, if true, present an objectively substantial risk of serious harm—including the risk of inmate-on-inmate attacks—to inmates. This risk violates the Eighth Amendment's

requirement 'that inmates be furnished with the basic human needs, one of which is "reasonable safety."'" Id. (quoting Helling v. McKinney, 509 U.S. 25, 33 (1993)).

The Eleventh Circuit has specified that Hale and Marsh are not the "proverbial 'floor' of liability for Eighth Amendment purposes" but that the conditions evidenced by the records must be "sufficiently grave to violate the Constitution." Purcell, 400 F.3d at 1323. "Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts." Id. at 1320. The cases below evidence facts courts have considered insufficient to establish that prison conditions "rose to the level of a 'substantial' or 'sufficiently serious' risk as opposed to some lesser risk of harm[,]" given that "[i]n the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." See id. at 1323 (citation omitted).

In Purcell, the Court determined that the record did not support the plaintiff's contention that jail conditions posed the substantial risk of serious harm necessary for a constitutional violation where the inmates were segregated based on a number of particularized factors (including the type of crime committed and potential personal conflicts with others); the jail was properly staffed (with the typical number of five officers being on duty during the night of the subject attack); officials had a history

of addressing and punishing inmate violence; the fights that occurred were not linked to any recurring specific cause; and the guards testified they periodically walked the cellblock. Id. at 1321-23.

In Harrison v. Culliver, 746 F.3d 1288 (11th Cir. 2014), the plaintiff adduced evidence of thirty-three incidents on inmate-on-inmate violence involving weapons over the span of three-and-a-half years, four of which occurred in the same hallway where the plaintiff was assaulted, in a prison which housed between 830 and 990 inmates. Id. at 1299-1300. The Court concluded that the evidence presented was "hardly sufficient to demonstrate that [the facility] was a prison 'where violence and terror reign.'" Id. at 1300 (citation omitted).

In Lorenzo v. Williams, 2018 WL 3863529 (S.D. Ga. July 30, 2018), there was evidence that the prison had an average of six inmate-on-inmate assaults per month in a population of 1500-1600 in the year the decedent was attacked. Id. at *7. The district court concluded "that these superficial statistics [were] insufficient to demonstrate a substantial risk of serious harm to inmates at [the prison]." Id.

In Marbury, the plaintiff affirmed that he had personally witnessed fifteen apparently gang-related inmate stabbings prior to the incident in which he was stabbed, had sent a written request to the warden asking to be moved to another dorm (he described his

dorm as an "over-rated gang affiliated block"), and had made several more in-person requests to be transferred. 936 F.3d at 1231. The Eleventh Circuit panel majority found the evidence insufficient to establish deliberate indifference based on a general risk of inmate-on-inmate violence. Id. at 1235. The panel majority expounded that in cases where the Eleventh Circuit had previously "held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent." Id. The panel majority stated that although the record showed that inmates faced some risk of assaults by fellow prisoners, the plaintiff had failed to identify "specific features of the prison that would make it particularly violent." Id.; but cf. Dickinson v. Cochran, 833 F. App'x 268, 275 (11th Cir. 2020) (per curiam) (finding that plaintiff sufficiently alleged "specific feature of the jail that render[ed] it particularly violent" where the plaintiff "alleged overcrowding, failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates").

Here, Pitts has alleged that no guards were present in the kitchen area at the time he was stabbed. Pitts has also alleged that a correctional officer was stabbed to death in Holman's

kitchen "recently before" his own attack, that "guys bring knives in there on a regular basis[,]" and that "several inmates got either stabbed or their throats slashed while eating in there." (Doc. 1 at 5). Finally, Pitts has attested that prior to his attack, "the camp had been on lockdown because of inmate on inmate violence." (Doc. 41-1 at 16). Such facts are simply insufficient to carry Pitts' burden of showing that he was housed in a prison "where violence and terror reign" and where "serious inmate-on-inmate violence was the norm or something close to it." See Marbury, 936 F.3d at 1234. Pitts' generalized allegations lack context, dates, or any specific details necessary to allow the Court to reasonably conclude that violence is the norm at Holman, nor do his allegations identify specific features of Holman or its population which render it particularly violent. See id. at 1235. Although Pitts' allegations show that there was clearly some risk of inmate-on-inmate violence at Holman and its dining hall, Pitts has not produced evidence "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." See id. Indeed, Pitts has presented far less evidence about the level of violence at Holman and its dining hall than the evidence presented in both Harrison and Marbury, which the Eleventh Circuit found insufficient to show that inmate-on-inmate violence was so pervasive that it amounted to the substantial risk of serious harm necessary to support a

deliberate indifference claim. Pitts' allegations establish a mere possibility of injury, but they fail to carry his burden of establishing the strong likelihood of injury. See Brown, 894 F.2d at 1537.

In sum, the record evidence is insufficient to show that inmate-on-inmate violence was so prevalent that it constituted a substantial risk of serious harm to which the correctional officer Defendants were deliberately indifferent. Accordingly, Pitts has failed to establish an Eighth Amendment violation against the correctional officer Defendants, and those Defendants are entitled to qualified immunity. Thus, it is recommended that summary judgment be **GRANTED** in favor of Defendants Officers Bullard, Norman, and Parham.

### Defendants Stewart, Mitchell, Raybon, Bolar, Smith, and Kidd

Pitts has alleged that Defendants Stewart, Mitchell, Raybon, Bolar, Smith, and Kidd, as supervisors, are liable for failing to provide a safe living environment at Holman, specifically for failing to put "safety measures in place to curtail the violence in the chow hall." (Doc. 1 at 8-10). Defendants have put forth testimony and evidence that rules, regulations, and policies are in place to help prevent incidents of inmate-on-inmate violence. Defendants testify that every inmate incarcerated by ADOC is oriented with an inmate handbook that sets forth ADOC's rules, regulations, and policies, including the restriction on bartering,

trading, or accepting gifts from another inmate.  (Doc. 26-1 at 1;
Doc. 26-2 at 1-2; Doc. 26-3 at 1; Doc. 37-1 at 1).  A staff member
reviews this handbook with every inmate entering ADOC.  (Doc. 26-
1 at 1-2; Doc. 26-2 at 1-2; Doc. 26-3 at 2).

Defendants maintain that there are also procedures in place
at Holman to help reduce incidents such as stabbings, i.e.,
frequent unannounced searches are conducted of each inmate's
person, inmate living areas, and other institutional areas to
ensure the safety of the inmates; all officers are required to
conduct five random searches of the inmate population daily; and
monthly area searches of the institution are also conducted.  (Doc.
26-1 at 2; Doc. 26-2 at 2; Doc. 26-3 at 2; Doc. 37-1 at 2).
Moreover, the Post Assignment Roster for July 1, 2018 reflects
that an officer was assigned to the kitchen area, a hall rover was
assigned, and all cubicles were manned.  (Doc. 26-7 at 2).  Thus,
the burden shifts to Pitts to establish a causal connection linking
the supervisory Defendants' actions to the alleged constitutional
violation.  See Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988)
(per curiam) ("Supervisory liability under section 1983 may be
shown either by the supervisor's personal participation in the
acts that comprise the constitutional violation or the existence
of a causal connection linking the supervisor's actions with the
violation.").  Pitts fails to make the necessary showing here.

> The necessary causal connection can be established "when
> a history of widespread abuse puts the responsible
> supervisor on notice of the need to correct the alleged
> deprivation, and he fails to do so." Gonzalez, __ F.3d
> at __, 2003 U.S. App. LEXIS 5762, 2003 WL 1481583, at *5
> (quoting Braddy v. Fla. Dept. of Labor & and Employment,
> 133 F.3d 797, 802 (11th Cir. 1998)); Brown, 906 F.2d at
> 671. Alternatively, the causal connection may be
> established when a supervisor's "'custom or policy . . .
> result[s] in deliberate indifference to constitutional
> rights'" or when facts support "an inference that the
> supervisor directed the subordinates to act unlawfully
> or knew that the subordinates would act unlawfully and
> failed to stop them from doing so." Gonzalez, __ F.3d
> at __, 2003 U.S. App. LEXIS 5762, 2003 WL 1481583, at *5
> (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir.
> 1991)); Hartley, 193 F.3d at 1263; see also Post v. City
> of Ft. Lauderdale, 7 F.3d 1552, 1560-61 (11th Cir.
> 1993). "The standard by which a supervisor is held
> liable in [his] individual capacity for the actions of
> a subordinate is extremely rigorous." Gonzalez, __ F.3d
> at __, 2003 U.S. App. LEXIS 5762, 2003 WL 1481583, at *4
> (internal quotation marks and citation omitted).

Cottone v. Jenne, 326 F.3d 1352, 1360-61 (11th Cir. 2003).

Pitts alleges in his complaint that the supervisors knew the
kitchen area was a dangerous, violent place because an officer was
once stabbed and killed there by an inmate while on duty. (Doc.
1 at 5). He also alleges that "several" other inmates have been
stabbed or slashed with knives in the dining hall, and that "guys
bring knives in there on a regular basis." (Id.). Pitts further
alleges that the chief steward "had been complaining everyday about
how the administration needed to provide the chow hall with some
type of reliable security" because Holman was known to be
"notoriously dangerous[.]" (Id.). Finally, he alleges that "the

camp had been on lockdown because of inmate on inmate violence."
(Doc. 41-1 at 16).

Pitts' allegations are largely conclusory and reflect merely a generalized risk of violence insufficient to rise to a constitutional violation. See Brooks v. Warden, 800 F.3d 1295, 1301 (11th Cir. 2015) (discussing that a "mere possibility" of harm is not enough to state an Eighth Amendment claim and that "the plaintiff must plausibly allege a strong likelihood of serious harm"). As previously discussed, to establish a generalized risk of violence sufficient to support a claim of deliberate indifference to a substantial risk of serious harm, Pitts must present specific facts demonstrating "that serious inmate-on-inmate violence was the norm or something close to it," or point to "specific features of [the] facility or its population rendering it particularly violent." Marbury, 936 F.3d at 1234-35; see also Dickinson, 833 F. App'x at 274-75 (comparing the holdings of Hale, Marsh, and Marbury, and explaining "that if the only evidence of deliberate indifference to inmate-on-inmate abuse is that jail officials knew about a generalized risk of violence, without more, the evidence must show that the risk was so great is was something close to normalized violence or a reign of terror").

Here, as in Marbury, Pitts' sworn allegations support the inference that he faced some generalized risk of attack, but "such evidence does not support the conclusion that serious inmate-on-

inmate violence was so pervasive that it constitutes a substantial risk of serious harm to which defendants were deliberately indifferent." See Marbury, 936 F.3d at 1234. Notably, Pitts fails to allege the nature of any of the referenced inmate-on-inmate incidents at Holman, the frequency of the incidents, the time frame in which the alleged incidents occurred, or any particularized concerns regarding the kitchen. Pitts also fails to identify any specific features of Holman, its kitchen, or its population that make it particularly violent. Pitts' sparse and generalized allegations simply do not demonstrate a level of violence necessary to show an objectively substantial risk of serious harm or Defendants' deliberate indifference to such risk, as required by this circuit's case law.

For these reasons, Pitts has failed to establish an Eighth Amendment violation, and the supervisory Defendants are entitled to qualified immunity. Thus, it is recommended that summary judgment be **GRANTED** in favor of Defendants Wardens Stewart, Mitchell, and Raybon, Captains Bolar and Smith, and Lieutenant Kidd.

## IV. CONCLUSION

Based on the foregoing, the undersigned recommends that summary judgment be **GRANTED** in favor of Warden Cynthia Stewart, Warden Phillip Mitchell, Warden Terry Raybon, Captain Regina Bolar, Captain Vencini Smith, Lieutenant Ashley Kidd, Correctional

Officer Jermaine Bullard, Correctional Officer Vincent Norman, and Correctional Officer Douglas Parham, and that Plaintiff's claims against them be **DISMISSED.**

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **16th** day of **November, 2021.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**
